**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**WILLIAM F. NEFSKY,**

           **Plaintiff,**

    **v.**                            **1:15-cv-2119-WSD**

**UNUM LIFE INSURANCE
COMPANY OF AMERICA,**

             **Defendant.**

**OPINION AND ORDER**

This matter is before the Court on Defendant Unum Life Insurance

Company of America's ("Defendant") Motion for Summary Judgment [19].

**I.    BACKGROUND**

    A.    <u>The Disability Insurance Policy</u>

On June 9, 1979, Defendant issued a disability insurance policy ("Policy") to

Plaintiff William F. Nefsky ("Plaintiff").  ([19.4] at 2).  The Policy required

Defendant to make payments to Plaintiff in any month, before June 9, 2013,[1] in

which Plaintiff was "totally disabled" or "residually disabled."  (Def. Statement of

---

[1]    The Lifetime Sickness Benefit Rider, described later in this Order, provides
for some continuation of coverage after this date.

Undisputed Material Facts [19.1] ("DSMF") ¶¶ 2, 5).[2]  The Policy defines "totally disabled" and "residually disabled" as follows:

> "Total disability" and "totally disabled" mean injury or sickness[3] restricts the Insured's ability to perform the material and substantial duties of his regular occupation to an extent that prevents him from engaging in his regular occupation.[4]
>
> "Residual disability" and "residually disabled" mean injury or sickness does not prevent the Insured from engaging in his regular occupation, BUT does restrict his ability to perform the material and substantial duties of his regular occupation:  (i) for as long a time as he customarily performed them before the injury or sickness; or (ii) as effectively as he customarily performed them before the injury or sickness.

(DSMF ¶ 5).

The Policy also includes a Lifetime Sickness Benefit Rider (the "Rider"), which is "subject to the terms and conditions of th[e] rider and the rest of th[e] policy."  (DSMF ¶¶ 7-8).  The Rider provides for continuation of coverage in the event of a total disability based on certain conditions.  The Rider states that,

---

[2]    Plaintiff was required to be disabled for thirty or ninety days—known as an "elimination period"—before Defendant was required to make the monthly payments described in the Policy.  (DSMF ¶ 2; [19.4] at 4-5).

[3]    "'Sickness' means a mental or physical illness or condition which has been diagnosed or treated."  ([19.4] at 10).

[4]    "'Regular occupation' means the Insured's occupation at the time [the Insured first becomes impaired].  If the Insured engages primarily in a professionally recognized specialty at that time, his occupation is that specialty."  (DSMF ¶ 5; [19.4] at 10).

2

beginning on June 9, 2013, Defendant is required to make payments to Plaintiff in any month in which:

1.   the Insured is totally disabled; and

2.   that total disability:

    a.   is the result of sickness which began before [June 9, 2008] and while this rider was in effect; and

    b.   his total disability began before [June 9, 2008] and has been continuous until the month for which this benefit is payable.

(DSMF ¶¶ 9-13).[5]  The Rider provides that:

When used in this rider only:  "Total disability" and "totally disabled" mean

1.   sickness restricts the Insured's ability to perform the material and substantial duties of his regular occupation to an extent that prevents him from engaging in his regular occupation; and

2.   the Insured is receiving medical care from someone other than himself which is appropriate for that sickness.

(DSMF ¶ 11).

    B.   <u>Plaintiff's Occupation</u>

In 1974, Plaintiff began working for Precious Metals Exchange, a company

---

[5]   The Rider does not include a payment end date.  Defendant's obligation to make monthly payments under the Rider is not triggered until the expiration of a thirty- or ninety-day "elimination period."  (DSMF ¶ 11).  The exact length of the elimination period depends on Plaintiff's coverage group, which is unclear from the record.  (<u>See</u> [19.4] at 4-6).

that sold gold and silver coins and bars to investors.  (DSMF ¶ 14).  In 1978, Plaintiff bought Precious Metals Exchange and incorporated it as WFN Enterprises, Inc. ("WFN").  (DSMF ¶ 15).  Plaintiff is the president and sole shareholder of WFN.  (DSMF ¶ 16).  He exercises "complete control" over WFN and has done so continuously since 1978.  (DSMF ¶ 17).

In the late 1970s, Plaintiff, through WFN, started buying and selling watches and jewelry.  (DSMF ¶ 19).  He continues to do so today.  Plaintiff also buys and sells china, crystal and silverware.  (DSMF ¶¶ 19, 23).  Plaintiff often purchases items—especially watches—wholesale from manufacturers.  (DSMF ¶ 25).  He also purchases items from estates, stores with excess inventory, and stores going out of business.  (DSMF ¶ 26; [20] at 63).  Watches constitute the largest portion of Plaintiff's inventory.  (DSMF ¶ 24; see [20] at 48 ("[P]rimarily, I've worked with watches.")).  Plaintiff has taken courses on grading diamonds and color stones, but he is not a certified gemologist.  (DSMF ¶¶ 20-21).  He describes himself as a "Business Broker."  (DSMF ¶ 22; see also [23] at 2).

Plaintiff's inventory is stored in an office space, which he has rented for the last twenty years.  (DSMF ¶ 30).  The office has a workroom, with good lighting, where Plaintiff processes "small inventory deals."  (DSMF ¶ 31).  Plaintiff sells most of his inventory on eBay.  (DSMF ¶ 33).  He also sells items at trade shows,

4

through his company website, and occasionally over the telephone if he is contacted by a former customer.  (DSMF ¶¶ 26, 34-36).  His products are not sold in a showroom or store.  (DSMF ¶ 32).  Plaintiff, using a template, drafts descriptions of the items he sells online.  (DSMF ¶ 37).  It usually takes him about fifteen (15) minutes to draft a description.  (DSMF ¶ 38).  He composes only one description for an item he buys in bulk.  (DSMF ¶ 39).  These descriptions are posted on eBay and WFN's website.

In the late 1990s, Plaintiff hired Mike Hoffland ("Hoffland") to maintain Plaintiff's eBay account, to photograph and lists the items to be sold, and to fill any orders received over the internet.  (DSMF ¶¶ 40-43).[6]  Hoffland retrieves, inspects, packages and ships WFN items sold online.  (DSMF ¶ 44).  If Hoffland discovers a defect in the item, he raises the issue with Plaintiff.  (DSMF ¶ 45).  Daniel Marino has handled WFN's bookkeeping since 1978.  (DSMF ¶ 46).  He pays WFN's bills and maintains records of the company's purchases and sales.  (DSMF ¶ 47).

C.    Plaintiff's Disability

On November 8, 2006, Plaintiff suffered a retinal vein occlusion.  (DSMF ¶ 48).  He was fifty-nine (59) years old at the time.  (DSMF ¶ 49).  The incident

---

[6]    Hoffland owns On the Road Publishing, a company that appears to offer similar services to other businesses.  (DSMF ¶ 40; [22] at 55).

severely impaired Plaintiff's vision in his left eye.  (DSMF ¶ 48).  Plaintiff's

reading vision in his left eye is now 20/40 or 20/50.  ([20] at 40).[7]  His vision in his

right eye is 20/25 or 20/30, which he considers "pretty good."  ([20] at 40, 50).

The damage to Plaintiff's left eye causes his right eye to "tire out much faster."

([20] at 50).  This prevents him from "analyz[ing] items for more than short

periods of time" because his vision "blur[s] out in a short period."  (DSMF ¶¶ 50,

71; [20] at 50).  It has not resulted in other physical limitations.  (DSMF ¶ 51).

Plaintiff is able to drive, hike, bike, swim, jog, and travel for pleasure.  (DSMF

¶ 52).

　　　Plaintiff previously was able to visually evaluate "three-dimensional"

products for up to eight hours a day.  (DSMF ¶ 72; [20] at 49, 67).  With his

diminished eye sight, he can only do this kind of evaluation for a maximum of two

hours a day.  (DSMF ¶ 72; [20] at 47, 50).  As a result, he sometimes declines

business opportunities that would require him to inspect items for long periods of

time.  ([20] at 48).[8]  In 2007, Plaintiff lost one watch manufacturer's business

---

[7]　　　Plaintiff can see colors and shapes with his left eye.  (See [20] at 40).

[8]　　　Plaintiff pursues these opportunities when he is able to obtain short-term
help from others in the industry.  (See, e.g., [20] at 48, 66-67; DSMF ¶ 83).
Plaintiff testified "they have continued to supply me even though I've had an issue
[with my vision] because I have been able to delegate some of the work to others.
I have been able to delegate a lot of the work to others and keep up with the

because he told them he could not evaluate 1,600 of their watches. (DSMF ¶73). Plaintiff continues to attend trade shows where he still engages in the buying and selling of items. (DSMF ¶¶ 88, 90).[9] In 2015, he attended a trade show in Las Vegas and six or seven trade shows in Atlanta. (DSMF ¶ 89). Plaintiff is unable to do "complicated," "task oriented" reading for other than short periods of time. ([20] at 47).

Plaintiff continues to purchase watches at wholesale prices. (DSMF ¶ 74). Manufacturers often call him and ask him if he is interested in buying excess inventory. (DSMF ¶ 78). Plaintiff takes fifteen minutes, or less, to decide whether to make the purchase. (DSMF ¶ 79). Plaintiff considers his finances, whether he has "staff to do the fulfillment," and the price at which the items are selling in secondary markets. (DSMF ¶ 80). He typically buys a limited number of watch models in large quantities. (DSMF ¶ 77). Plaintiff also "occasionally help[s] some[one] broker a collection" of watches. (DSMF ¶ 85).

Plaintiff remains a representative for at least two watch manufacturers. (DSMF ¶ 75). He is the exclusive representative for Reactor watches, and also

---

quality." (DSMF ¶ 83). Plaintiff also testified that he "sometimes . . . farm[s] something out and get[s] a commission on the back end." ([20] at 58).

[9]    Plaintiff is not able at trade shows to "exhibit" his products. (DSMF ¶¶ 86-87). He did, however, exhibit items at a trade show in 2007, shortly after his retinal vein occlusion. (DSMF ¶ 87).

sells watches manufactured by Wenger.  (DSMF ¶ 76).  He continues to advertise in two trade magazines.  (DSMF ¶ 91).  He continues to evaluate and purchase items from estates and jewelry businesses.  (DSMF ¶¶ 93, 96).  In 2015, he traveled to jewelry stores in North Carolina and Florida, where he evaluated and purchased items from both stores.  (DSMF ¶ 95).  He sometimes has products "shipped directly from [a jewelry store] and he doesn't even have to physically handle it."  (DSMF ¶¶ 92, 94).  In 2015, Plaintiff sold approximately 1,500 watches on eBay and listed other items that did not result in a sale.  ([22] at 42-43). Plaintiff has a computer at home, uses an iPhone and an iPad, and has three computers on his desk at work.  (DSMF ¶¶ 53-54).[10]  Plaintiff's business is operational today and has continued, uninterrupted, since the reduction of vision in his left eye.  (DSMF ¶¶ 68-69).

D.    Plaintiffs' Claims for Disability Benefits

On December 6, 2006, a month after his retinal vein occlusion, Plaintiff submitted a claim for disability benefits under the Policy.  (DSMF ¶ 56).  Plaintiff, at the time, was working ten to twenty hours per week.  (DSMF ¶ 57).  Before his vision reduction, he generally worked forty to eighty hours per week.  (DSMF

---

[10]    Plaintiff is able to watch television for up to two hours at a time.  ([20] at 43).

¶ 70).  Plaintiff claimed he was totally disabled under the Policy.  (DSMF ¶ 61).

Defendant determined he was residually disabled.  (DSMF ¶ 59).  Defendant made

residual disability payments to Plaintiff from approximately November 8, 2006

through June 9, 2013.  (DSMF ¶¶ 63-64).

On August 1, 2013, Plaintiff contacted Defendant and requested disability

benefits under the Rider.  (DSMF ¶ 65).  Plaintiff stated he was "totally disabled"

and had been since June 9, 2008.  (DSMF ¶ 65).  On October 3, 2013, Defendant

denied Plaintiff's claim for disability benefits.  (DSMF ¶ 66).  Defendant

concluded that Plaintiff was residually disabled, not totally disabled, and that he

was thus ineligible for payments under the Rider.  (DSMF ¶ 66).

### E.   Procedural History

On May 14, 2015, Plaintiff filed his Complaint [1.1] in the State Court of

DeKalb County, Georgia.  Plaintiff asserts a claim for breach of contract, arguing

that Defendant refused to pay him disability benefits to which he is entitled under

the Rider.  Plaintiff also asserted a claim, under O.C.G.A. § 33-4-6, for penalties

and attorney's fees on the grounds that Defendant, in bad faith, "refused to pay

[him] within sixty (60) days after [he] made a demand for payment" under the

Rider.  (Compl. ¶ 23).  Plaintiff seeks payment of the disability benefits, interest,

penalties, and attorney's fees.

On June 12, 2015, Defendant removed this action from state court.  ([1]).
On March 2, 2016, Defendant filed its Motion for Summary Judgment, seeking
summary judgment on Plaintiff's claims.  Defendant argues that Plaintiff is not
entitled to disability benefits because he is not "totally disabled" under the Rider.
On March 21, 2016, Plaintiff filed his Brief in Opposition to Defendant's Motion
for Summary Judgment [23], arguing that he is "totally disabled" and thus is
entitled to payments under the Rider.

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is appropriate where the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there is no genuine issue
as to any material fact and that the moving party is entitled to judgment as a matter
of law." Ahmed v. Air France-KLM, 165 F. Supp. 3d 1302, 1309 (N.D. Ga.
2016); see Fed. R. Civ. P. 56.  "An issue of fact is material if it 'might affect the
outcome of the suit under the governing law.'"  W. Grp. Nurseries, Inc. v. Ergas,
167 F.3d 1354, 1360 (11th Cir. 1999) (quoting Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986)).  "An issue of fact is genuine 'if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party.'"  Id. at 1361
(quoting Anderson, 477 U.S. at 248).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying [materials] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The movant[] can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof." Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1281-82 (11th Cir. 1999). The moving party need not "support its motion with affidavits or other similar materials *negating* the opponent's claim." Celotex, 477 U.S. at 323. Once the moving party has met its initial burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham, 193 F.3d at 1282. The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." Id. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48.

11

"If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted." Apcoa, Inc. v. Fid. Nat. Bank, 906 F.2d 610, 611 (11th Cir. 1990) (internal quotation marks omitted) (quoting Anderson, 477 U.S. at 250). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)); cf. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (a party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict" (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997) (internal quotation marks omitted))).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott, 550 U.S. at 380. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury." Graham, 193 F.3d at 1282. "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." Id.

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex, 477 U.S. at 322-23; see Freeman v. JPMorgan Chase Bank N.A., -- Fed. App'x --, 2017 WL 128002, at *4 (11th Cir. Jan. 13, 2017) (same); Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1247 (11th Cir. 1999) ("If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted.").

## III.   DISCUSSION

###   A.   Insurance Contracts under Georgia Law[11]

"Insurance in Georgia is a matter of contract and the parties to the contract

of insurance are bound by its plain and unambiguous terms."  Hurst v. Grange Mut.

Cas. Co., 470 S.E.2d 659, 663 (Ga. 1996); see Yeomans & Assoc. Agency,

Inc. v. Bowen Tree Surgeons, Inc., 618 S.E.2d 673, 677 (Ga. Ct. App. 2005)

("[A]n insurance policy is simply a contract, the provisions of which should be

construed as any other type of contract.").

"Where the terms and conditions of an insurance contract are clear and

unambiguous, they must be given their literal meaning."  Adams v. Atlanta Cas.

Co., 509 S.E.2d 66, 68 (Ga. App. Ct. 1998); see Donaldson v. Pilot Life Ins. Co.,

341 S.E.2d 279, 280 (Ga. Ct. App. 1986) ("Where the language fixing the extent of

coverage is unambiguous, . . . and but one reasonable construction is possible, this

court must enforce the contract as written.").  If the terms of the policy are

ambiguous, "the statutory rules of contract construction will be applied,"

Pomerance v. Berkshire Life Ins. Co. of Am., 654 S.E.2d 638, 640 (Ga. Ct. App.

2007), and the ambiguities will "be strictly construed against the insurer as the

---

[11]     "In diversity cases, the Court is bound by the applicable state law governing the contract, in this case Georgia law."  Giddens v. Equitable Life Assur. Soc. of U.S., 445 F.3d 1286, 1297 (11th Cir. 2006).

14

drafter of the document," Federated Mut. Ins. Co. v. Ownbey Enterprises, Inc.,
627 S.E.2d 917, 921 (Ga. App. Ct. 2006); see Giddens, 445 F.3d at 1297 ("[W]hen
a policy is ambiguous, or is capable of two reasonable interpretations, it is
construed in the light most favorable to the insured and against the insurer.").
"[A] word or a phrase is ambiguous when it is of uncertain meaning and may be
fairly understood in more ways than one." Ownbey Enterprises, 627 S.E.2d at 921
(citation and internal quotation marks omitted).

"[W]here an insurance contract contains unambiguous terms excluding
coverage," however, "no construction is required, and the plain meaning of the
terms must be given full effect without straining to extend coverage where none
was contracted or intended." State Farm Fire & Cas. Co. v. Bauman, 723 S.E.2d 1,
3 (Ga. Ct. App. 2012). "[A]n insurance company is free to fix the terms of its
policies as it sees fit, so long as such terms are not contrary to law."
Henning v. Cont'l Cas. Co., 254 F.3d 1291, 1295 (11th Cir. 2001) (internal
quotation marks omitted) (quoting Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc., 466
S.E.2d 4, 6 (Ga. 1996)).

"[T]he interpretation of an insurance policy, including the determination and
resolution of ambiguities, is a question of law for the court to decide." Giddens,

445 F.3d at 1297 (citing O.C.G.A. § 13-2-1); see Pomerance, 654 S.E.2d at 640

("The proper construction of a contract is a question of law for a court to decide.").

       B.      Plaintiff's Claim for Breach of Contract

The Rider requires Defendant to make payments to Plaintiff only if Plaintiff

is "totally disabled." (DSMF ¶ 11). The question in this case is whether Plaintiff

is totally disabled.

The Rider states that "totally disabled" means "sickness restricts the

Insured's ability to perform the material and substantial duties of his regular

occupation to an extent that prevents him from engaging in his regular

occupation." (DSMF ¶ 11).[12] The Georgia Court of Appeals has defined the

"material and substantial duties of [an insured's] occupation" as "most or a vast

majority of the material duties" of the occupation. Pomerance, 654 S.E.2d at 639,

642; see also Giddens, 445 F.3d at 1298. To be totally disabled under the Rider in

this case, Plaintiff's eye condition must restrict his ability to perform most or a vast

majority of the material duties of his occupation "to an extent that prevents him

from engaging in his regular occupation."

---

[12]     The Insured also must be "receiving medical care from someone other than himself which is appropriate for that sickness." (DSMF ¶ 11). Defendant does not dispute that Plaintiff is receiving medical care for the impairment in his left eye.

Plaintiff's business involves buying and selling watches, jewelry and other related items.  The undisputed evidence is that Plaintiff continues to engage in that business today and does so substantially.  He continues to buy and sell items at trade shows, over the telephone, and over the internet.  He actively seeks new business by advertising in two trade magazines.  He is the exclusive representative for one watch manufacturer and represents still another.  He continues to purchase watches at wholesale, and "occasionally help[s] some[one] broker a collection" of used watches.  He evaluates and purchases items from estates and jewelry stores. In 2015, he attended seven or eight trade shows, sold approximately 1,500 watches on eBay, and traveled to jewelry stores in North Carolina and Florida where he evaluated and purchased items from both stores.  He is able to purchase items in bulk, from stores with which he is familiar, without "physically handl[ing]" the items at issue.  ([21] at 44).  He continued to work ten or twenty hours per week after his retinal vein occlusion.  Cf. Socas v. Nw. Mut. Life Ins. Co., 829 F. Supp. 2d 1262, 1269, 1271 (S.D. Fla. 2011) ("Dr. Socas was a general dentist both before and after the automobile accident.  After the accident, she was able to perform some, but not all of her previous duties as a general dentist. . . .  Dr. Socas' undisputed ability to continue performing general dentistry after her automobile accident means that she was not totally disabled."); see also Fountain v. Unum Life

17

Ins. Co. of Am., 677 S.E.2d 334, 337 (Ga. Ct. App. 2009); Girardeau v. Guardian Life Ins. Co., 287 S.E.2d 324, 324 (Ga. Ct. App. 1981).

Plaintiff's only eye-related limitation is that he cannot "analyz[e] items for more than short periods of time" because his vision "blur[s] out." This means he is unable to do certain eye-intensive tasks, such as product inspection, for as long as he could before damaging his left eye. It does not, however, prevent him from meaningfully engaging in those tasks,[13] from engaging in other material tasks not dependent on intense focus of the eyes,[14] or from otherwise running his business. The Rider defines "residually disabled" under the Rider:

> "Residual disability" and "residually disabled" mean injury or sickness does not prevent the Insured from engaging in his regular occupation, BUT does restrict his ability to perform the material and substantial duties of his regular occupation:  (i) for as long a time as he customarily performed them before the injury or sickness; or (ii) as effectively as he customarily performed them before the injury or sickness.

(DSMF ¶ 5).

---

[13]   For example, Plaintiff could previously evaluate "three-dimensional" products for up to eight hours a day.  He can now do so for a maximum of two hours a day.  He also continues to draft descriptions for the products he sells online.

[14]   These tasks include negotiating transactions, traveling for work, weighing the merits of a business proposal, networking (at trade shows, for example), and managing his staff.

Plaintiff is residually disabled only.  Plaintiff's eye condition restricts his ability to perform certain tasks "for as long [or as effectively] as he customarily performed them before [his] injury or sickness."  It does not, however, "prevent[] him from engaging in his regular occupation."  He continues to operate WFN and engage in his occupation.  Considering the facts in the light most favorable to Plaintiff, the Court finds that, given the terms of the Rider, no reasonable jury could find in favor of Plaintiff in this action.  Plaintiff is not totally disabled, he is not eligible for payments under the Rider, and Defendant thus is entitled to summary judgment on Plaintiff's breach of contract claim.  Cf. Fountain, 677 S.E.2d at 337 ("Total disability exists when one is wholly disabled from pursuing the usual and customary duties of his employment on which he must depend for a living.  Total disability is the antithesis of partial disability.  One is the opposite of the other."); Girardeau, 287 S.E.2d at 324 ("[T]he insurer is not liable as for a total disability when the accident or disease has merely prevented the insured from doing as much in a day's work as before.  Such lessened earning capacity may be a case of partial disability, but not a case of total disability.").

C.   Plaintiff's Claim for Statutory Penalties and Attorney's Fees

Plaintiff asserts a claim, under O.C.G.A. § 33-4-6, for penalties and attorney's fees on the grounds that Defendant, in bad faith, "refused to pay [him]

19

within sixty (60) days after [he] made a demand for payment" under the Rider. (Compl. ¶ 23).  Penalties and attorney's fees are available under section 33-4-6 only "[i]n the event of a loss which is covered by a policy of insurance."  O.C.G.A. § 33-4-6(a).  Plaintiff has not established any loss covered by the Policy and is not entitled to statutory penalties or attorney's fees.  See Orr v. Dairyland Ins. Co., 899, 273 S.E.2d 630, 631 (Ga. Ct. App. 1980) ("In the absence of basic liability by [the insurer], there likewise could have been no liability for statutory penalties or attorney fees."); ([23] at 18).  Defendant is entitled to summary judgment on Plaintiff's section 33-4-6 claim.

IV.   **CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [19] is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

**SO ORDERED** this 15th day of February, 2017.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

20